# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **JESSE WILLIAMS,** | § | |
| | § | |
| **v.** | § | **A-10-CA-979-SS** |
| | § | |
| **RICK THALER, Director,** | § | |
| **Texas Department of Criminal Justice** | § | |
| **Correctional Institution Division** | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

TO:   THE HONORABLE SAM SPARKS
       UNITED STATES DISTRICT JUDGE

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrates, as amended, effective December 1, 2002.

Before the Court are pro se Petitioner Jesse Williams's Petition for a Writ of Habeas Corpus (Document 1), Answer with Brief in Support of Respondent, Rick Thaler, Director of the Texas Department of Criminal Justice, Correctional Institutions Division (Document 9), and Williams's Reply (Document 12). For the reasons set forth below, the undersigned finds that Williams's application for writ of habeas corpus should be denied.

### STATEMENT OF THE CASE

### I.   PROCEDURAL HISTORY

Williams challenges the Director's custody of him pursuant to a judgment and sentence of the 390th Judicial District Court of Travis County, Texas, in Cause No. 3021005. *Ex parte Williams*,

Application No. 74,675, at 7-9.[1]  Williams was charged with injury to a child with serious bodily injury, pled not guilty, and was tried by a jury.  *Id.* at 2-3, 7.  On October 15, 2004, Williams was found guilty and sentenced to life imprisonment.  *Id.* at 7.

Williams's conviction was affirmed by the Third Court of Appeals of Texas on June 8, 2008. *Williams v. State*, 257 S.W.3d 426 (Tex. App.–Austin 2008, pet. ref'd).  Williams then filed a petition for discretionary review which was refused by the Texas Court of Criminal Appeals on December 17, 2008.  *Williams v. State*, 272 S.W.3d 614 (Tex. Crim. App. 2008).  Subsequently, Williams filed an application for state writ of habeas corpus challenging his conviction.  *Ex parte Williams*, Application No. 74,675, at 49.  The Texas Court of Criminal Appeals denied the application on the findings of the trial court without a hearing on September 29, 2010.  *Id.* at cover. On December 27, 2010, Week's petition in this Court was entered on the docket.  Pet. at 1.

II.     FACTUAL BACKGROUND

The court of appeals summarized the evidence presented as follows:

**The Events**

> On May 14, 2002, firefighters responded to a 911 call placed by appellant asking them to come to the aid of an unconscious child.  The firefighters found appellant and his mother standing on a street corner.  The woman was holding an unconscious infant, later identified as two-and-a-half-year-old D.B., the son of appellant's girlfriend, Eugenie Rochelle Bradshaw.  When the firefighters arrived, D.B. was limp and unresponsive to stimuli, including pain.  It was immediately apparent to them that something was seriously wrong with the child neurologically. They also saw both recent and older scabs on the boy's chest and what appeared to be deep scratches all over his body.

---

[1]  Citations to pleadings and documents in the state-court habeas record appear as *Ex parte Williams*, Application No. 74,675, followed by a page number.  [#] C.R. at [#] indicates a reference to a particular volume of the Clerk's Record in the trial court, and [#] R.R. at [#] indicates citation to a particular volume of the Reporter's Record.

The firefighters asked appellant what had happened to the child. Appellant said that "this is probably going to be my fault." His mother asked, "What did you do?" Appellant said that D.B. had had a bowel movement in his pants and so he punished him. As the firefighters worked to revive the child, appellant, who smelled strongly of alcohol, "stood around" looking nervous.

Appellant was also questioned at the scene by Police Officer Carlos Vallejo.[1] Appellant told Vallejo that D.B. had been disobedient, so he grabbed him by the arm and spanked him three or four times using the palm of his right hand. Appellant told the officer that D.B. had broken into a "cold sweat" and that he thought he might have given D.B. a "rude awakening."

> FN1. Appellant does not question the admissibility of his statements to Vallejo.

As the EMS technicians were putting D.B. into the ambulance, his body began "posturing," an indication that his brain was starting to swell. At the hospital, doctors discovered bleeding and swelling throughout the child's brain and indications that he had been violently shaken. He had suffered renal failure. His buttocks were badly bruised and swollen from being beaten with some sort of blunt object. It appeared that the child had been beaten, shaken, and then "left for dead." D.B. survived, but he is disabled for life.

**The Interviews**

The following day, May 15, Detective Robert Merrill interviewed appellant in an interview room at the police station. Appellant was brought to the station in handcuffs, but he was not cuffed or restrained during the interview.[2] At the beginning of the interview, Merrill advised appellant of his *Miranda* rights, and appellant said that he understood. *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966). The interview continued as follows:

> FN2. The State initially stipulated at the pretrial hearing that appellant was in custody. The State later argued that appellant was not in custody because the handcuffs were removed and appellant was told that he was not under arrest.

Q. Do you have any questions about those rights?

A. I want to terminate everything right now.

Q. You want to terminate . . .

3

A.  You're telling me that I'm under arrest.

Q.  No, you're not.

A.  (Inaudible).

Q.  They–they cuffed you up.

A.  Yes, they did.  They claim I was being detained.

Q.  Right.  And I'm gonna protect me and you.  Now, you know your rights.  You–you don't have to talk to me if you don't want to.

A.  That's the only reason why I came down here was to comply with–with whatever his name was, the other detective.

Q.  Detective Faithful?

A.  Uh-huh.

Q.  Okay.  We would like to have an idea so we can tell the doctor what happened, give him an idea of how to treat your boy, but that's your decision to make.  You said you want to terminate it.  Do you want to terminate or do you want to talk to me?

A.  No, I want to help to comply–to help–to help my son, uhh–

Q.  To help your son?

A.  Yes, I do.

Without further hesitation, appellant began to answer Merrill's questions.  Appellant talked about the days before the 911 call in great detail, describing how he had cared for D.B., where he went with him, what D.B. did and ate, D.B.'s general health, and who else cared for him.  Appellant also described some of his disciplinary measures, including a brief spanking on the night of the 911 call, after which D.B. fell and hit his head on the floor.  Appellant said that he spanked D.B. no more than once per day.  Often, he would put D.B. in a particular position with his hands on the ground or have him stand in the corner with his hands up for time out, instead of spanking him.  Appellant denied pushing D.B. or doing anything that could cause a brain injury.  Appellant admitted having about three beers on the night he called 911.  He said he was not drunk and had not smoked any marihuana.  Appellant

emphasized that D.B. had suffered numerous falls: backwards onto the floor, off of the front porch steps, at the gym, in the bathtub, and from a swing.

Appellant was allowed to leave the police station after the May 15 interview, and a police officer gave him a ride to the hospital. Appellant was arrested for injury to a child with serious bodily injury two days later, on May 17. After his arrest, he was interviewed by Merrill a second time. He was again advised of his rights and agreed to waive those rights. In this May 17 interview, appellant initially stated that he used only periodic spankings and time-outs in certain positions to discipline the child. As the interview continued, appellant admitted shaking D.B. on two separate occasions, once on the night of the 911 phone call and once a week before that call. He said that when he shook D.B., the child's head swung all the way back and all the way forward. Appellant said that he knew he "went overboard" but that he was not trying to injure D.B., only to rear him properly.

On May 18, appellant called the police station from jail wanting to speak to Merrill. Merrill returned appellant's call and, without appellant's knowledge, recorded the conversation. Appellant told Merrill that on the night the boy was injured, he "may have went a little bit overboard." He explained that he had been smoking marihuana that may have been laced with PCP and may have consumed three or more beers.

**The Pretrial Hearing**

Following a hearing, the trial court overruled appellant's motion to suppress the videotapes and transcripts of the May 15 and May 17 interviews. With respect to the May 15 interview, the court determined that appellant's statement that he wanted to "terminate everything right now," considered in the context of the total conversation and appellant's demeanor as shown on the videotape, did not amount to an unambiguous assertion of his right to terminate the interview. The court said:

> The court finds that after reading all of the transcript and watching the video that the defendant did not unambiguously assert his right to terminate the interview, and I made this determination by considering the conversation between the defendant and the Detective Merrill. . . . And it's clear to this court that the defendant was attempting to clarify what Detective Merrill meant and that was, he was trying to clarify whether he was in custody . . . .

> Also considering the entire conversation, it's clear that Detective Merrill never uses coercion or tries to–he tries to clarify for the defendant to see if he is actually terminating everything. He's trying to clarify whether he's in custody. And you have to take in the

totality of the conversation and also the tape and the demeanor of the witnesses.

I do understand that just on its face from what the defendant says, "I want to terminate everything," it seems like it's clear. However, if you look at the entire interaction between the two, it's clear that the defendant was confused and that Detective Merrill was trying to clarify and get an unambiguous statement from the defendant about what he wanted to do.

The court concluded that the May 15 statement was the product of custodial interrogation, but that appellant had been properly advised of his rights and had voluntarily waived those rights and spoken to the detective in full compliance with article 38.22. *Se*e TEX. CODE CRIM. PROC. ANN. art. 38.22 (West 2005).

The court also found that the May 17 statement was made during custodial interrogation, but again concluded that appellant knowingly waived his rights and gave the statement voluntarily. The court did suppress large portions of appellant's May 18 telephone conversation with Merrill, finding that the statements were in response to interrogation and that appellant had not been advised of his *Miranda* rights that day. The court ruled that the statement about the PCP-laced marihuana was admissible, however, because it was made spontaneously and not in response to questions by the officer.[3]

FN3. Appellant does not challenge the court's ruling regarding the telephone conversation.

**The Trial**

The jury heard the police and medical testimony summarized above. Consistent with the trial court's ruling, the jury also saw and heard appellant's May 15 and May 17 statements, and heard the admissible portions of the May 18 telephone call.

D.B.'s mother, Eugenie Rochelle Bradshaw, testified that she had known appellant for several years, and that they had had an "off-and-on relationship." In January 2002, appellant moved into the apartment that Bradshaw and D.B. shared with one of her relatives. During this time, appellant cared for D.B. while Bradshaw worked. Around May 1, Bradshaw and D.B. left the apartment and moved in with a friend, while appellant moved in with his mother. Appellant continued to care for D.B. In fact, D.B. was essentially living with appellant and his mother, and Bradshaw would visit with him for an hour or so every other day. Bradshaw testified that appellant was responsible for feeding, dressing, and bathing D.B. She said that

prior to May 14, she never saw appellant impose any excessive physical discipline, and that she did not observe any physical or cognitive injuries to D.B. prior to May 14.

Appellant testified in his own defense. He said that he was not an experienced parent and that he disciplined D.B. by spanking him approximately once a day. He also made D.B. stand in a corner with his hands up or forced him to stand in a "V" position with his hands on the floor. He twice disciplined D.B. by shaking him. Appellant said he did not know that shaking a child could cause serious bodily harm and that he would not have done so had he known. He recounted several accidental injuries to D.B.'s head, including falls from a swing, a step, in a bathtub, at the gym, and against the couch.

On cross-examination, appellant testified that he was upset on the night he called 911 because D.B. had a dirty diaper, refused to bring appellant a candy bar, and refused to go to bed. He admitted spanking the boy repeatedly on top of his swollen, bruised bottom and demonstrated how he shook the boy for 30 to 45 seconds. Appellant acknowledged that he shook D.B. until the child became unconscious and started gasping for air.

Throughout his testimony, appellant insisted that he did not intentionally or knowingly injure D.B. Appellant told the jury, "I admit I made a mistake . . . . And the only thing I can honestly say is, I apologize to the mother for trying to rear him the best way I can. I had limited knowledge. I'm not the smartest person in the world . . . I did my best."

In his closing argument, appellant's counsel did not seek to persuade the jury that appellant had not injured D.B. Instead, he stressed that appellant had not intended to injure the child and did not know that his actions would cause such injury.

> This is what he's culpable and responsible for. Accepting care of a child, an infant child when he shouldn't have, when he wasn't a parent, when he'd never done any babysitting, when he had never done any parent training.
>
> . . .
>
> He had so little experience that when the child exhibited cognitive or motor deficits, he didn't even recognize them. Doesn't even–it's below knowing. He doesn't even know. He's doesn't know, in the words of government's lawyers, until it's almost too late. And then it took the intervention of his mother to say, what on earth has happened? How could this be? He says, I don't know. I'm just doing the best I can.

Remember, he didn't say, I intended to hurt the child, or I knew I was going to hurt the child. He said, I did the best I can, and I made a mistake and I caused accidents.

. . .

We also believe that there are certain physical acts, occurrences and events that contributed to the injuries. We clearly believe falling contributed. We clearly believe being ejected from a swing contributed. We clearly believe slipping in the bathtub contributed. Falling on the bleachers contributed. All of these acts and occurrences contributed. Shaking, spanking. We agree to all of that. It's self-evident and obvious. No doubt about it.

But then the question then occurs, during the course of the spank or the shake or the push or the pull, was it your conscious objective and desire, was it your intent to cause the result? When you–when you do the swat, is it your conscious intent and desire to cause these kinds of injuries, or are you aware that this–or this is going to cause these kinds of injuries? We think the answer is simple.

And we think you'd best refer to Detective Merrill and Jesse Williams himself. Both say accident, mistake. I didn't think you meant to do it. I didn't mean to do it. I confess a mistake.

*Williams*, 257 S.W.3d at 428-32.

### III.    WILLIAMS'S GROUNDS FOR RELIEF

Williams raises the following grounds for relief:

1.    During voire dire, the prosecution improperly attempted to commit venire members by asking prospective jurors if they had ever seen the bumper sticker or heard the expression, "Never shake a baby." Pet. at 7-7a (Claim 1).[2]

2.    After testimony about Williams's cognitive or reasoning deficits at the punishment phase, the trial court erred by not sua sponte holding a competency hearing to determine if Williams was competent to stand trial. *Id.* (Claim 2).

---

[2] The claim numbers correspond to the numbering of the claims in the petition. *See* Pet. at 7-8b.

3.  Williams was subjected to custodial interrogation even after he stated that he wanted to terminate discussion, making the statements obtained inadmissible. *Id.* at 7a-7b (Claim 3).

4.  Williams was denied effective assistance of counsel at trial because:

    a.  although his attorney filed a notice of business record filing regarding the Austin Police Department's General Orders, Policies, and Procedures, he did not present that record for the trial court's consideration during the suppression hearing, and the evidence would have been suppressed under department policies, *id.* at 8-8a (Claim 4(a));

    b.  his attorney did not direct the defense psychologist to inquire into and testify regarding Williams's drug use as a mitigating factor, despite the fact that drug use may have affected Williams's intent, *id.* (Claim 4(b)); and

    c.  his attorney did not move to strike the jury panel or "rotate" panel members when the prospective jury panel lacked any African-Americans, *id.* at 8a-8b (Claim 4(c)).

## IV.  EXHAUSTION OF STATE REMEDIES, STATUTE OF LIMITATIONS, AND SUCCESSIVE PETITION BAR

The Director asserts that Williams procedurally defaulted Claims 1 and 2, but exhausted his state court remedies on the remaining claims.  Answer at 10.  The Director does not contend that the petition is barred by limitations, 28 U.S.C. § 2244(d), or subject to the successive petition bar, 28 U.S.C. § 2244(b).  *Id.*

## DISCUSSION AND ANALYSIS

## I.  REVIEW UNDER THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is defined by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Section 2254(d) states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). By its terms, § 2254(d) bars relief on any claim "adjudicated on the merits" in state court, subject only to the exceptions in § 2254(d)(1) and (d)(2). *See, e.g., Harrington v. Richter,* – U.S. –, 131 S. Ct. 770, 780-81 (2011). Federal habeas relief may not be granted for claims subject to § 2254(d) unless the state habeas court's decision "was contrary to" federal law then clearly established by holdings of the Supreme Court, 28 U.S.C. § 2254(d)(1); *(Terry) Williams v. Taylor,* 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000), "involved an unreasonable application of" such law, 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts" in light of the record before the state court, 28 U.S.C. § 2254(d)(2).

In *Williams,* the Supreme Court explained the "contrary to" and "unreasonable application" provisions of § 2254(d)(1):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-13, 120 S. Ct. at 1523. An application of federal law is "unreasonable" only if it is "so clearly incorrect that it would not be debatable among reasonable jurists." *Nobles v. Johnson,* 127 F.3d 409, 418 (5th Cir. 1997) (quotation and citation omitted).

Section 2254(d)(2) likewise commands deference to the state habeas court's factual determinations by precluding relief on any claim that was adjudicated on the merits in state-court proceedings unless the state-court decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d)(2). Such determinations are presumed to be correct, although a petitioner can rebut this presumption with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The presumption of correctness not only applies to explicit findings of fact, but also to "those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning. *See, e.g., Harrington*, 131 S. Ct. at 780-81. Under § 2254(d)*,* a state court need not cite or even be aware of Supreme Court decisions. *Id.* (citing *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (*per curiam*)). When a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden is met by showing that there was no reasonable basis for the state court to deny relief. *Id.* This is so whether or not the state court indicates which of the elements in a multi-part claim it found insufficient; as the Supreme Court explained, § 2254(d) applies when a "claim," not a component of one, has been adjudicated. *Id.*

With these principles in mind, the Court turns to the issues raised in this case.

## II.   WILLIAMS'S GROUNDS FOR RELIEF

Having independently reviewed the entire state-court record and Williams's asserted claims, the Court concludes that Williams's first two claims were not exhausted in state court and are procedurally barred in this Court. With regard to the remaining claims, the Court finds nothing unreasonable or contrary in the state court's application of clearly established federal law or its determination of facts in light of the evidence, as discussed below.

### A.   Prosecution Statement During Voire Dire and Absence of Competency Hearing (Claims 1, 2)

Williams's first claim asserts that the prosecution improperly attempted to commit venire members by asking prospective jurors if they had ever seen the bumper sticker or heard the expression, "Never shake a baby." Pet. at 7-7a (Claim 1). Williams's second claim advances that after testimony at the punishment phase that he had cognitive or reasoning deficits, the trial court should have sua sponte held a competency hearing to determine if Williams was competent to stand trial. Pet. at 7-7a (Claim 2); *see also* 9 R.R. at 98-115 (testimony by Travis County Sheriff's Office counselor from its cognitive reasoning and rehabilitation program).[3] The Director asserts that Williams's first two claims are barred by procedural default, as determined by the state habeas court. Answer at 14-15.

---

[3] Williams does assert that the trial court should have sua sponte held a competency hearing, but his real complaint is that his trial, specifically the punishment phase, should have included testimony from a psychologist regarding how the cognitive or reasoning deficits referenced by a Travis County Sheriff's Office counselor would have supported mitigating factors. *See* Pet. at 7-7a; Reply at 3-4.

When Williams raised these two claims in his state habeas application, the state court found that they could have been raised on direct appeal and, therefore, could not be raised in a state habeas application. *Ex parte Williams*, Application No. 74,675, at 85; *see also id.* at cover (denying application without written order on findings of habeas trial court). Texas law requires that a habeas petitioner must raise on direct appeal any claim based upon the trial-court record or review of the claim is forfeited. *See Ex parte Townsend*, 137 S.W.3d 79, 81 (Tex. Crim. App. 2004) (explaining that writ of habeas corpus may not be used "in matters that should have been raised on appeal"); *see also Scheanette v. Quarterman*, 482 F.3d 815, 827 (5th Cir. 2007) ("this rule is an 'adequate state ground capable of barring federal habeas review'"); *Finley v. Johnson*, 243 F.3d 215, 219 (5th Cir. 2001) (invoking same procedural default to bar federal habeas review).

It is well settled that federal habeas review of a claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default. *Coleman v. Thompson*, 501 U.S. 722, 735, 111 S. Ct. 2546, 2557 (1991); *Harris v. Reed*, 489 U.S. 255, 265, 109 S. Ct. 1038, 1044 (1989); *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995). The state court explicitly found that Claims 1 and 2 should have been presented on direct appeal. *Ex parte Williams*, Application No. 74,675, at 85.

To avoid the procedural bar, Williams must show that the state procedural rule is not regularly followed or was applied in an "exorbitant" manner under the circumstances. *See Lee v. Kemna*, 534 U.S. 362, 376, 122 S. Ct. 877, 886-87 (2002); *Wright v. Quarterman*, 470 F.3d 581, 586 (5th Cir. 2006). Williams has filed a reply, but he does not attempt to demonstrate that the procedural rule at issue was improperly applied. Accordingly, Williams's first two claims are

procedurally barred from federal habeas review unless he demonstrates the applicability of an exception.

When a state court has explicitly relied on a procedural bar, a habeas petitioner may still obtain federal habeas review of a claim if he can show cause and actual prejudice for the procedural default or that a failure to address the merits of the federal claim would result in a miscarriage of justice. *Moore v. Roberts*, 83 F.3d 699, 702-04 (5th Cir. 1996) (citing *Coleman*, 501 U.S. at 750, 111 S. Ct. at 2565). Williams has failed to show, or even suggest, cause for the default or actual prejudice and has made no showing that a failure to address the merits of the federal claim would result in a miscarriage of justice. Absent such, the state court's explicit application of a procedural bar precludes habeas review of these two claims in this Court.

### B. Admissibility of Interview Statements (Claim 3)

Williams contends that he was subjected to custodial interrogation at the May 15 police interview even after he communicated that he wanted to terminate discussion, making the statements obtained inadmissible. Pet. at 7-7b.[4] The Director asserts that the state court reasonably applied federal law in rejecting this claim. Answer at 15-24.

Consistent with the Fifth Amendment guarantee that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. CONST. amend. 5, law enforcement officials, before questioning a person in custody, must inform him that he has the right to remain silent and

---

[4] Williams also asserts that the statements were obtained in violation of Austin Police Department policies, Pet. at 7b; Reply at 7-8, but federal habeas relief is available only to address violations of rights under federal law. *See, e.g., Malchi v. Thaler*, 211 F.3d 953, 957 (5th Cir. 2000). Accordingly, to the extent that Williams's claim is predicated on violation of Austin Police Department policies, the claim should be denied. The Court addresses the claim as it relies on alleged violations of federal law.

that any statement he makes may be used against him in court. *Dickerson v. United States*, 530 U.S. 428, 435, 442, 120 S. Ct. 2326, 2331, 2335 (2000); *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). "If the individual [in custody] indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473-74, 86 S. Ct. at 1627; *see also Berghuis v. Thompkins*, – U.S. –, 130 S. Ct. 2250, 2260 (2010) (requiring that a defendant unambiguously invoke the right to silence for an effective invocation).

In reviewing the state habeas court's judgment, this Court considers the decision of the state court of appeals on this claim, which was relied upon by the state habeas court. *See Ex parte Williams*, Application No. 74,675, at 85 (referencing Third Court of Appeals decision in rejecting claim). As excerpted below, the Third Court of Appeals examined the claim and held that Williams did not unambiguously invoke his right to silence, and alternatively determined that in any event, any error in admitting the statements at issue was harmless.

## DISCUSSION

In his first issue on appeal, appellant contends that his Fifth Amendment rights were violated on May 15 when Merrill continued to question him after he attempted to terminate the interview. In his second issue, appellant asserts that the unlawful May 15 interview tainted the interview on May 17. He urges that the trial court erred by admitting the two statements.

### Standard of Review

An appellate court should afford almost total deference to a trial court's determination of the historical facts that the record supports, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Hollingsworth v. State*, 15 S.W.3d 586, 591 (Tex. App.–Austin 2000, no pet.). Appellate courts should give the same amount of deference to a trial court's rulings on "application of law to fact questions," also known as "mixed questions of law and fact," if the resolution of

those ultimate questions turns on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89; *Hargrove v. State*, 162 S.W.3d 313, 318 (Tex. App.–Fort Worth 2005, pet. ref'd). Appellate courts review de novo "mixed questions of law and fact" not falling within this category. *Guzman*, 955 S.W.2d at 89; *Hargrove*, 162 S.W.3d at 318. At the hearing on a motion to suppress, the trial court is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony. *Ramirez*, 44 S.W.3d at 109. The trial judge may choose to believe or disbelieve any or all of a witness's testimony. *Id.*

**Right to Terminate Questioning**

The right to terminate questioning is among the procedural safeguards that *Miranda* establishes. *Miranda*, 384 U.S. at 474, 86 S.Ct. 1602. This right, which safeguards the Fifth Amendment right to remain silent, requires the police to immediately cease custodial interrogation when a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent." *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008) (quoting *Miranda*, 384 U.S. at 473-74, 86 S. Ct. 1602). There is no talismanic word or phrase with which to invoke the right to remain silent. *Watson v. State*, 762 S.W.2d 591, 597 (Tex. Crim. App. 1988). Any declaration of a desire to terminate the contact or inquiry should suffice. *Ramos*, 245 S.W.3d at 418. The suspect need not object to further questioning in order to protect the right to remain silent. *Watson*, 762 S.W.2d at 599.

The threshold question is whether the suspect invoked his right to silence. *Ramirez v. State*, 44 S.W.3d 107, 110 (Tex. App.–Austin 2001, no pet.). An interrogating officer need not stop his questioning unless the suspect's invocation of rights is unambiguous. *Ramos*, 245 S.W.3d at 418; *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996). A police officer does not violate a suspect's right to remain silent when he attempts to clarify whether the suspect wishes to remain silent, and the suspect may thereafter choose to continue to speak about the offense. *Hopkins v. Cockrell*, 325 F.3d 579, 583 (5th Cir. 2003); *Barnes v. Johnson*, 160 F.3d 218, 224-25 (5th Cir. 1998) (officer did not violate defendant's right to silence when he attempted to clarify whether defendant wished to invoke right with "a few explanatory, noncoercive questions," and defendant chose to keep talking). In determining whether the right to remain silent was unambiguously invoked, courts look to the totality of the circumstances. *Watson*, 762 S.W.2d at 597. Ambiguity exists when the suspect's statement is subject to more than one reasonable interpretation under the circumstances. *See Dowthitt*, 931 S.W.2d at 257 (holding that suspect's statement, "I can't say more than that. I need to rest," was ambiguous and indicated only that suspect believed that he was physically unable to continue); *Franks v. State*, 90 S.W.3d 771, 787 (Tex. App.–Fort Worth 2002, pet. ref'd,

untimely filed) (suspect's statement that he was tired and did not want to talk anymore was ambiguous and merely indicated that suspect was physically unable to continue).

**The May 15 Statement**

In *Hargrove*, the suspect was being questioned when he said, "Let's just terminate it." 162 S.W.3d at 319. The interrogating officer asked, "Do you want to stop now?" and the suspect replied, "Why should we go on because I'll be spinning my wheels. You're spinning your wheels." *Id.* However, the suspect never answered the officer's question about whether he wanted to stop, continued speaking without clarifying his remark, and never again asked to end the interview. *Id.* The court held that the suspect's "terminate it" comment was ambiguous and that his rights were not violated by the continuation of the interrogation. *Id.* at 319-20.

The videotape of appellant's May 15 interview shows that appellant was left alone in the interrogation room after being brought to the station. After a period of silence, he began railing against the police in a long string of obscenities and said, "Least you all can talk to me or let me go, arrest me or something. . . . Talk to somebody." Merrill reentered the room and appellant said, "I'm trying to see if I'm getting talked to or what. Yeah, I'm trying to see how my boy's doing. *You guys need to talk to me, arrest me or whatever. . . .*" (Emphasis added.) Merrill asked appellant for his name and inquired how he was doing. Appellant complained about having been in handcuffs but said that he was fine. Merrill then advised appellant of his rights and asked if he had any questions. As noted previously, appellant responded "I want to terminate everything right now." When Merrill asked appellant to confirm that he "want[ed] to terminate," appellant interrupted to say, "You're telling me that I'm under arrest." At this point, it was reasonable for the officer to believe that appellant's main concern was that he was under arrest. After a brief discussion of appellant's arrest status, Merrill said, "Now you know your rights. You–you don't have to talk to me if you don't want to." When appellant said that he came to the police station to "comply with" the other detective, Merrill repeated that it was up to appellant and again asked if appellant wanted to terminate the interview. Appellant said he wanted to help his son and the interview continued. The officer did not threaten, badger, or coerce appellant. Appellant displayed no reluctance to answer the officer's questions.

When appellant told Merrill that he wanted to "terminate everything," the officer did not simply ignore the statement and continue questioning. Instead, the officer sought to clarify appellant's wishes before continuing the interview. *See Marshall v. State*, 210 S.W.3d 618, 628 (Tex. Crim. App. 2006) (federal

constitutional law does not prohibit officer from clarifying whether arrestee wished to waive right to remain silent). After viewing the videotape, we agree with the trial court's conclusion that appellant's statement that he wanted to "terminate everything," when considered in the context in which it was made–which includes appellant's statement moments earlier that "[y]ou guys need to talk to me, arrest me or whatever"–did not constitute an unambiguous invocation of the right to silence. Rather, appellant appeared frustrated by his detention and was attempting to determine whether he had been arrested. Giving due deference to the fact finder's credibility determinations, we conclude that the court did not abuse its discretion by overruling the motion to suppress and admitting the May 15 interview into evidence.[4] *See Ramirez*, 44 S.W.3d at 109.

> FN4. *See Milburn v. State*, No. 03-02-00458-CR, 2004 WL 210620, at \*\*4-5, 2004 Tex. App. LEXIS 1057, at \*12-14 (Tex. App.–Austin Feb. 5, 2004, pet. ref'd) (mem. op.) (not designated for publication) (cited for illustrative purposes only) (suspect said "I don't have nothing to say," officer responded by repeating suspect's statement in the form of a question; officer's action was not calculated to elicit an incriminating response; suspect's subsequent admission manifested a desire to continue the conversation and did not unambiguously invoke the right to silence).

The concurring opinion argues that it is inappropriate to consider the context in which appellant's statement was made, urging that such an approach is contrary to the holding in *Ramos*. In *Ramos*, the suspect told the interrogating officer that "he didn't want to talk to [the officer]. That he didn't want to talk about it anymore." 245 S.W.3d at 413. The court of criminal appeals held:

> [Ramos's] statement to [the officer] that he did not want to talk to him was an unambiguous, unequivocal, and unqualified assertion of the right to remain silent. A reasonable police officer in [the officer's] position would not have found [Ramos's] assertion of his right to be ambiguous. Any ambiguity in [Ramos's] other statement to [the officer], that he did not want to talk about "it" anymore, was, in context, entirely irrelevant.

*Id.* at 418-19 (citation omitted and emphasis added). Contrary to the argument in the concurring opinion, the court of criminal appeals in *Ramos* considered the context in which the critical statements were made. What distinguishes *Ramos* from this case is that Ramos's statement, "I don't want to talk to you," is clearer and less ambiguous than appellant's statement, "I want to terminate everything right now." We do not

believe that *Ramos* prohibits the trial court or this Court from considering the context in order to ascertain appellant's meaning.

We further conclude, for reasons we will discuss below, that if appellant's statement that he wanted to "terminate everything right now" was under the circumstances an unambiguous request to remain silent, and if Merrill failed to scrupulously honor that request by continuing to question appellant, and if the trial court erred by admitting the May 15 videotaped interview into evidence, the error was harmless. In order to explain this alternative holding, we must first discuss appellant's challenge to the admission of the May 17 videotaped interview.

**The May 17 Statement**

In his second issue, appellant contends that his May 17 statement to the police was erroneously admitted because it was "tainted" by the May 15 statement. It is unclear from his brief whether appellant is asserting that: (1) because he invoked his right to remain silent on May 15, the police could not interview him on May 17, or (2) the May 17 statement was the tainted fruit of the inadmissible May 15 statement.

Appellant relies primarily on the holding in *Michigan v. Mosley*, 423 U.S. 96, 96 S. Ct. 321, 46 L.Ed.2d 313 (1975). Mosley was arrested in connection with a series of robberies, taken to a police interrogation room, and advised of his *Miranda* rights. *Id.* at 97, 96 S. Ct. 321. After Mosley said that he did not want to answer any questions about the robberies, the arresting officer immediately ended the interrogation, and Mosley was taken to a jail cell. *Id.* More than two hours later, Mosley was taken from his cell to another interrogation room, where a different officer advised him of his rights and began to question him about a homicide unrelated to the offenses for which he had been arrested. *Id.* at 98, 96 S. Ct. 321. Mosley did not invoke his right to remain silent, did not ask for counsel, and gave a statement implicating himself in the homicide. *Id.* It was undisputed that the later interrogation fully complied with *Miranda* procedures when considered alone, but Mosley urged that it was impermissible for the second officer to question him about the homicide after he had told the first officer that he did not want to talk about the robberies. *Id.* at 98-99, 96 S. Ct. 321.

The *Mosley* Court rejected any reading of *Miranda* under which a person who has invoked his right to silence can never again be subjected to custodial interrogation. *Id.* at 101-02, 96 S. Ct. 321. Instead, the admissibility of statements obtained after a person in custody has decided to remain silent depends on whether the right to cut off questioning was scrupulously honored. *Id.* at 104, 96 S.Ct. at 321. The Court concluded that Mosley's right to cut off questioning had been fully

respected: "[T]he police here immediately ceased the [first] interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." *Id.* at 106, 96 S.Ct. 321. Under *Mosley*, courts must evaluate the facts of each case to determine if the resumption of police interrogation was consistent with scrupulous observance of the right to cut off questioning. *Maestas v. State*, 987 S.W.2d 59, 62 (Tex. Crim. App. 1999).

For the purposes of our discussion of appellant's second issue, we will assume that Merrill failed to scrupulously honor appellant's right to remain silent by continuing to question him on May 15 after appellant said he wanted to "terminate everything." We do not believe, however, that *Mosley* compels the conclusion that Merrill was precluded from approaching appellant on May 17 and obtaining an admissible statement. After the May 15 interview ended, appellant was released from custody and allowed to go home. Appellant remained at large for two days, until he was arrested for this offense on May 17. Before interviewing appellant on May 17, Merrill advised him of his rights and appellant voluntarily waived those rights. Considered alone, the May 17 interview fully complied with *Miranda* procedures. In light of the two-day period during which appellant was not in custody, we hold that appellant's invocation of the right to silence on May 15 did not carry over to the May 17 interview so as to render invalid appellant's waiver of the right to silence on the latter date.

Making a confession under circumstances that preclude its use does not perpetually disable the confessor from making a usable one after those circumstances have been removed. *Griffin v. State*, 765 S.W.2d 422, 428 (Tex. Crim. App. 1989) (quoting *United States v. Bayer*, 331 U.S. 532, 541, 67 S. Ct. 1394, 91 L.Ed. 1654 (1947)). It has never been held that the psychological impact of the voluntary disclosure of a guilty secret qualifies as State compulsion or compromises the voluntariness of a subsequent informed waiver of the right to remain silent. *Id.* at 429 (quoting *Oregon v. Elstad*, 470 U.S. 298, 312, 105 S. Ct. 1285, 84 L.Ed.2d 222 (1985)). When a person voluntarily makes an inculpatory statement under circumstances that render it inadmissible under *Miranda*, the dictates of *Miranda* and the goals of the Fifth Amendment are fully satisfied by barring the use of the statement. *Elstad*, 470 U.S. at 318, 105 S. Ct. 1285. No further purpose is served by imputing "taint" to a subsequent statement obtained pursuant to a voluntary and knowing waiver of the person's *Miranda* rights. *Id.*

The trial court found that appellant's May 15 and May 17 statements were given voluntarily, and appellant does not dispute this. As we have already noted, the May 17 statement was taken in full conformity to *Miranda*'s dictates. We hold that

even if the May 15 statement was inadmissible because appellant had invoked his right to remain silent, it did not taint the May 17 statement or otherwise render the May 17 statement inadmissible.

**Harmless Error**

We now turn to the question of whether, assuming the trial court erred by admitting the May 15 statement into evidence, the error was reversibly harmful. We conclude that it was not.

Appellant's trial testimony largely replicated the statements he made during the May 15 interview. Although appellant testified that the child accidentally fell and hit his head on a number of occasions, appellant did not deny striking and shaking D.B. during the days immediately preceding the emergency call. In fact, appellant admitted that on May 14, he had shaken D.B. until the child became unconscious and started gasping for air. Appellant's defense was not that he did not injure D.B., but that he did not intentionally or knowingly injure the child.

It cannot be persuasively argued that, but for the admission of the May 15 statement, appellant would have chosen a different defensive strategy. Even if the May 15 statement had not been admitted in evidence, the jury would have heard the testimony that when emergency workers found appellant with the child on May 14, he told them "this is probably going to be my fault." Appellant also said at the scene that he had grabbed D.B. and spanked him, and that this might have been a "rude awakening." The jury would also have heard appellant's May 17 videotaped statement, which was properly admitted in evidence. During this interview, appellant admitted that he twice shook D.B., once on the night of the emergency, that the child's head swung back and forth when he shook him, and that he knew that he "went overboard." The jury would also have heard portions of appellant's May 18 telephone call to Merrill, during which appellant admitted that he went "overboard" when he disciplined D.B. and that he had been smoking PCP-laced marihuana. Under the circumstances, it is likely that appellant's trial strategy would have been the same even if the court had suppressed the May 15 statement.

In short, there was considerable evidence of appellant's guilt even without the May 15 statement. *See Motilla v. State*, 78 S.W.3d 352, 358 (Tex. Crim. App. 2002) (evidence of defendant's guilt is factor to consider in harm analysis). In light of the record as a whole, we conclude beyond a reasonable doubt that the admission of the May 15 statement, if error, did not contribute to the conviction or the punishment. *See* Tex. R. App. P. 44.2(a).

## CONCLUSION

For all the reasons stated, we hold that the trial court did not err, or did not reversibly err, by admitting into evidence appellant's May 15 and May 17 statements. We overrule issues one and two, and we affirm the judgment of conviction.

*Williams*, 257 S.W.3d at 432-37.

Applying the legal principles to this case, and with due regard to the deferential standards of review required by the AEDPA, the Court concludes that the state court did not unreasonably apply clearly established federal law to Williams's case in rejecting the habeas claim premised on his invocation of the right to silence in the May 15 interview. On habeas review under the AEDPA, a constitutional error in a state-court criminal trial is sufficiently prejudicial, and can support habeas relief, only when it has a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 1714 (1993); *see also, e.g., Hughes v. Quarterman*, 530 F.3d 336, 345 (5th Cir. 2008), *cert. denied*, – U.S. –, 129 S. Ct. 2378 (2009). Even if the admitted evidence was indeed prejudicial, the erroneous admission of such prejudicial evidence "will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction." *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998).

Assuming, without deciding, that Williams indeed invoked his right against self-incrimination in the May 15 interview and that the statements from that interview were inadmissible as a result,[5] the state habeas court's rejection of this claim on the basis of harmless error was a

---

[5] Both the Third Court of Appeals's decision and the Texas Court of Criminal Appeals's refusal of Williams's petition for discretionary review drew concurrences that disagreed with the court of appeals majority opinion's conclusion that Williams's invocation of his right to silence was ambiguous and thus insufficient; those concurrences also concluded, however, that any error in the trial court's admissibility decision was harmless. *Williams*, 272 S.W.3d at 614-15 (Johnson, J., concurring); *Williams*, 257 S.W.3d at 437-38 (Puryear, J., concurring).

reasonable application of federal law. The May 15 statements were not a crucial or highly significant factor in Williams's conviction, and significantly, Williams does not contend that he would not have testified at trial or that his trial strategy would have differed in the absence of the statements.

During the May 15 interview, the police mainly learned information about Williams's care of the child, the chronology of preceding events, and various falls the child had suffered, and heard denials of acts that injured the victim or of ingesting drugs. 11 R.R. at State's Ex. 42 (recorded interview of J. Williams (May 15, 2002)). Williams testified at trial and his testimony in large part repeated statements from the May 15 interview. *See* 8 R.R. at 101-200.[6] No harm results from improperly admitted evidence if the same evidence is admitted through another source without objection. *See, e.g., United States v. Hall*, 500 F.3d 439, 444 (5th Cir. 2007). Because the May 15 statements were cumulative of other evidence, as explained by the Third Court of Appeals, *Williams*, 257 S.W.3d at 436, they were not crucial evidence and their admission, even if erroneous, was only harmless error. *See Brecht*, 507 U.S. at 637, 113 S. Ct. at 1722.

Williams's only argument for the inadmissibility of the May 17 statements is that the May 17 statements were the "fruits" of the May 15 interview. Reply at 6. The May 17 interview statements, however, were not rendered inadmissible by any such possible status for the May 15 statements. *See Dickerson*, 530 U.S. at 429, 120 S. Ct. at 2328 (noting that Court "refus[ed] to apply the traditional 'fruits' doctrine developed in Fourth Amendment cases"); *United States v. Cantu*, No. 10-50313, 2011 WL 1899490, at *2 (5th Cir. May 19, 2011) ("The *Elstad* Court rejected the

---

[6] Indeed, Williams's strategy at trial was not to deny that he had injured D.B., but to convince the jury that he was simply inexperienced with child care and did not understand that his actions would injure the child. *See Williams*, 257 S.W.3d at 431; 8 R.R. at 223-24.

argument that statements made in a properly conducted interrogation must be suppressed because the defendant let the cat out of the bag in an earlier, inadmissible interrogation.") (quotation and citation omitted). As a result, it cannot be said that interrogation statements obtained subsequent to inadmissible statements arising from custodial interrogation are, as Williams urges, per se inadmissible fruits under "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In fact, the opposite is true as the Supreme Court has repeatedly rejected such a per se rule. *See, e.g., Michigan v. Mosley*, 423 U.S. 96, 102-03, 96 S.Ct. 321, 326 (1975).[7]

Even considering Williams's challenge on a case-specific basis, his claim does not justify habeas relief. In *Mosley*, the Supreme Court held that the admissibility of statements obtained from a person in custody after that person has decided to remain silent in the initial encounter turns on whether the resumption of police interrogation was consistent with the "scrupulous" observance of the right to cut off questioning. 423 U.S. at 104, 96 S. Ct. at 326. The Court found four factors

---

[7] In *Mosley,* the Supreme Court explained:

[A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, neither this passage nor any other passage in the *Miranda* opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.

423 U.S. at 102-03, 96 S.Ct. at 326. And in *Oregon v. Elstad*, the Court held that "[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." 470 U.S. 298, 309, 105 S. Ct. 1285, 1293 (1985); *see also id.* at 318, 105 S. Ct. at 1298 ("The relevant inquiry is whether, in fact, the second statement was also voluntarily made.").

particularly telling: (1) whether police immediately ceased the initial interrogation upon the suspect's request; (2) whether questioning was resumed after a "significant period of time," *e.g.*, "an interval of more than two hours"; (3) whether a "fresh set of warnings" was provided; and (4) whether the topic of the second interrogation concerned a different crime. *See id.* at 105-06, 96 S. Ct. at 327-28; *see also Oregon v. Elstad*, 470 U.S. 298, 310, 105 S. Ct. 1285, 1293 (1985) (explaining that after an initial statement was obtained in technical violation of *Miranda*, such factors as "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether [the] coercion has carried over into the second confession"). The Fifth Circuit has read *Mosley* to include a fifth factor, implicit in the third, that "the suspect was advised prior to initial interrogation that he was under no obligation to answer question[s]." *United States v. Alvarado-Saldivar*, 62 F.3d 697, 699 (5th Cir. 1995). No single factor is dispositive, however, *see, e.g., Kelly v. Lynaugh*, 862 F.2d 1126, 1131 (5th Cir. 1988) (stating that "it is not decisive that the interrogations covered the same crime"); rather, a case-by-case analysis of the circumstances of each case and the police conduct is required, *Wilcher v. Hargett*, 978 F.2d 872, 877 (5th Cir. 1992).

Considering all the surrounding circumstances and the relevant factors, it was reasonable to conclude that the May 17 interview was sufficiently independent of and not tainted by the May 15 interview. There is no dispute that Williams was Mirandized prior to both interviews. Both interviews concerned the same crime, but a significant amount of time–two days–passed between the two interviews, and during that time, Williams was not in custody. After the May 15 interview, the police did not arrest Williams, but released him and drove him to the hospital where the victim

was being treated. 11 R.R. at State's Ex. 42, at 123; *Williams*, 257 S.W.3d at 429. There is no indication of any police contact with Williams for two days, until his arrest on May 17, at which point, he was again advised of his *Miranda* rights and again acknowledged that he understood those rights. *Id.*; 4 R.R. at 4. The same detective who conducted the first interview also questioned Williams in the second interview, Detective Merrill, 11 R.R. at State's Exs. 42, 43, but another detective also conducted the second interview, Detective Rosa Trejo, *see, e.g., id.* at State's Ex. 43, at 3. Williams does not complain about how the May 17 interview was handled, or assert that he was not Mirandized or did not voluntarily and knowingly waive his right not to speak at that interview.[8] Although the questions in the May 17 interview were more specific and confrontational because of the additional information that had been developed in the intervening two days, there is no indication in the record that Williams attempted to invoke his right not to speak or that the interview was administered with coercive tactics.

The circumstances in this case created a sufficient attenuation between the May 17 interview and any problem with the May 15 interview. The fact that between the two police interviews, Williams was free and without restrictions or police contact for two days is a significant factor in this case. *Cf., e.g., Mosley*, 423 U.S. at 104, 96 S. Ct. at 327 (permitting re-interview of suspect a mere two hours after initial refusal to speak to police); *Wilcher*, 978 F.2d at 877 (concluding that statements in subsequent interrogations were admissible under *Mosley* when shortest time between

---

[8] The trial court found that Williams was in custody at the May 17 interview, *Miranda* warnings were properly given, Williams voluntarily and knowingly waived his *Miranda* rights, and Williams knowingly and voluntarily made statements to the detectives. 4 R.R. at 4. Williams's argument in this Court is limited to a contention that the May 17 interview statements were necessarily tainted by the purported inadmissibility of the May 15 statements. Reply at 6 (citing fruit-of-the-poisonous-tree ruling of *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407 (1963)).

unproductive interrogations was two hours and defendant was in custody entire time).[9]  The record

in this case does not support the conclusion that the police "persist[ed] in repeated efforts to wear

down [Williams's] resistance and made him change his mind."  *Mosley*, 423 U.S. at 105-06, 96 S.

Ct. at 327.  Instead, the record indicates that Williams's right to cut off questioning at the second

interview was honored.

  In addition, as with his complaint about the May 15 statements, Williams does not argue that

his trial strategy would have been different or he would not have testified had the May 17 statements

not been admitted.  Williams thus fails to satisfy the *Brecht* standard for habeas relief and

demonstrate that any erroneously admitted statements were a "crucial, highly significant factor in

[his] conviction."  *Neal*, 141 F.3d at 214.

  In sum, even assuming that the trial court erred in deciding that statements from the May 15

interview were admissible, the error was not harmful or sufficiently prejudicial.  The state court's

---

  [9]  In *Missouri v. Seibert*, the Supreme Court considered the admissibility of statements obtained through a two-step interrogation technique to avoid *Miranda* warnings whereby police first obtained an inadmissible confession without giving *Miranda* warnings, then issued the warnings, and subsequently elicited a second, similar confession.  542 U.S. 600, 124 S. Ct. 2601 (2004).  Although the Supreme Court's decision in *Siebert* does not control this case because there is no evidence of a deliberate, two-stage strategy to deprive Williams of his protections against self-incrimination and *Miranda* warnings were delivered, *id.* at 622, 124 S.Ct. at 2616 (Kennedy, J., concurring), the Court's emphasis in *Siebert* on the timing of the two sequential interrogations is instructive.  *See id.* at 613-14,124 S. Ct. at 2611 (plurality op.) (rejecting effectiveness of *Miranda* warnings for second interrogation when first interrogation lacked *Miranda* warnings and the two interrogations were "coordinated and continuing" and "two spates of integrated and proximately conducted questioning").  In a concurrence regarded as the Court's holding, Justice Kennedy explained that "curative" steps, such as "a substantial break in time," could make a second, post-*Miranda* set of statements admissible.  *See id.* at 622, 124 S. Ct. at 2616 (Kennedy, J., concurring) ("a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn").

rejection of this claim falls within the realm of reasonableness. *See Harrington*, 131 S. Ct. at 780-81 (explaining that habeas petitioner must meet his burden by showing that there was no reasonable basis for the state court to deny relief). Its determination did not involve an unreasonable application of clearly established federal law or one contrary to that law, or an unreasonable determination of underlying facts. *See* 28 U.S.C. § 2254(d). Habeas relief is not available for this claim.

### C.       Ineffective Assistance of Trial Counsel (Claims 4(a)-(c))

Williams contends that he was denied effective assistance of counsel at trial because: (1) although his attorney filed a notice of business record filing regarding the Austin Police Department's General Orders, Policies, and Procedures, he did not present that record for the trial court's consideration during the suppression hearing, which permitted the evidence at issue to be admitted, *id.* at 8-8a; Reply at 7-8 (Claim 4(a)); (2) his attorney did not direct the defense psychologist, Dr. David R. Poole, to inquire into Williams's drug use as a mitigating factor or call him to testify on that point, despite the fact that drug use may have affected Williams's intent, Pet. at 8-8a; Reply at 9-10 (Claim 4(b)); and (3) his attorney did not move to strike the jury panel or "rotate" panel members when the prospective jury panel lacked any African-Americans, Pet. at 8a-8b; Reply at 11-13 (Claim 4(c)). In response, the Director counters as follows: (1) any erroneous admission of the statements was harmless; (2) Williams fails to show the requisite prejudice by demonstrating that Dr. Poole's potential testimony would have been favorable and he would have actually testified at trial; and (3) Williams fails to show that his counsel had a basis for an objection by demonstrating a prima facie violation of the fair cross-section requirement. Answer at 25-28.

Ineffective assistance of counsel claims are analyzed under the well-settled requirements set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant can make both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S. Ct. at 2064.

For the first requirement, the proper measure of attorney performance is "simply reasonableness under prevailing professional norms." *Id.* at 688, 104 S. Ct. at 2065. In deciding whether counsel's performance was deficient, the Court applies a standard of objective reasonableness, keeping in mind that judicial scrutiny of counsel's performance must be highly deferential. *Id.* at 686-89, 104 S. Ct. at 2064-65. "[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S. Ct. at 2065. Indeed, the Supreme Court has established that counsel should be "'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment,'" and cautioned against an "'intrusive post-trial inquiry into attorney performance'" and the "'tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence.'" *Cullen v. Pinholster*, – U.S. –, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 688-90, 104 S. Ct. at 2065-66).

For the second requirement, the question is whether there is a reasonable probability that, absent the alleged error, the result of the proceeding would have been different, a question that must be considered in the context of the entire evidence. *Strickland*, 466 U.S. at 694-95, 104 S. Ct. at 2068-69. A reasonable probability is "'a probability sufficient to undermine confidence in the outcome,'" *Cullen*, 131 S. Ct at 1403 (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068), which requires a "'substantial,' not just 'conceivable,' likelihood of a different result," *id.* (quoting *Harrington*, 131 S. Ct. at 791).

Accordingly, in order to prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a substantial likelihood that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 1403; *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. Because a convicted defendant must satisfy both *Strickland* requirements to demonstrate ineffective assistance, a failure to establish either deficient performance or prejudice makes it unnecessary to consider the other requirement. 466 U.S. at 697, 104 S. Ct. at 2069; *Black v. Collins*, 962 F.2d 394, 401 (5th Cir. 1992).

In addition to the "highly deferential" view that the Court takes of counsel's performance under *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065, the Court is also limited in its examination of such claims by the "'deferential lens of § 2254(d).'" *Cullen*, 131 S. Ct. at 1404 (quoting *Knowles v. Mirzayance*, 556 U.S. –, – n.2, 129 S. Ct. 1411, 1419 n.2 (2009)). In this way, the Court's review of the state habeas court's determination of ineffective assistance claims is "'doubly'" deferential. *Harrington*, 131 S. Ct. at 788 (quoting *Knowles*, 129 S. Ct. at 1420).

As discussed below, Williams's ineffective-assistance claims fail to satisfy *Strickland*'s and the AEDPA's prerequisites.

### 1. Business Record (Claim 4(a))

Williams asserts that his counsel was ineffective by failing to present a copy of the Austin Police Department's policies and procedures regarding interviews, stops, and arrests at the hearing on the motion to suppress which argued that the Austin police did not comply with department policies. Pet. at 8-8a; Reply at 7. Williams fails to show the necessary resulting prejudice of any possible professional error under *Strickland*.

The state habeas court determined that any professional error on the part of trial counsel was harmless. *Ex parte Williams*, Application No. 74,675, at 86; *see also Williams*, 257 S.W.3d at 432-37. As discussed, the state court made a reasonable determination under clearly established federal law in holding that even if the trial court erred in not recognizing Williams's May 15 invocation of the right to silence as an effective invocation, any error in this regard was harmless. *See supra* II.B. The same harmless-error reasoning extends to the prejudice analysis for this claim. Williams cannot demonstrate the prejudice necessary for this claim because any error on his counsel's part in failing to obtain a successful ruling on the motion to suppress was a harmless error.

The state court's determination of this habeas claim was not contrary to or an unreasonable application of clearly established federal law of *Strickland* nor was it based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). Williams is not entitled to habeas relief on this ground.

## 2.    Defense Psychologist Testimony on Drug Use (Claim 4(b))

The sole support for Williams's complaint that his trial counsel was ineffective by failing to pursue and put on testimony from the defense psychologist, Dr. Poole, regarding the potentially mitigating effect of Williams's possible drug use is a letter from Dr. Poole. *See Ex parte Williams*, Application No. 74,675, at 62. Williams apparently contacted the psychologist about this issue after the resolution of his direct appeal, and Dr. Poole responded to Williams's inquiry by explaining that he had not been able to assess and testify about Williams's insights and motivation for rehabilitation, which would have possibly included a background of drug use, because Williams presented himself to the psychologist as "essentially problem-free and unavailable for insight and rehabilitation at the time." *Id.* Accordingly, based on the only evidence offered by Williams, the psychologist was unable to assess this issue nor offer testimony on it. As a result, there is no basis to conclude that Williams's trial counsel committed a professional error in not pursuing and offering testimony from Dr. Poole on this topic.

Williams's claim fails for a second reason as well. In order for Williams to demonstrate the requisite *Strickland* prejudice, he must show that the testimony would have been favorable and that the witness would have testified at trial. *See Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002); *see also Martin v. McCotter*, 796 F.2d 813, 819 (5th Cir. 1986) ("hypothetical or theoretical testimony will not justify the issuance of a writ") (brackets, quotation, and citation omitted). When the state court addressed this claim, it rejected the claim after soundly finding that the letter from the psychologist indicated that the witness would not have offered beneficial testimony. *Ex parte Williams*, Application No. 74,675, at 86. Williams fails to satisfy the prejudice element of his claim.

Williams does not show that the state court's decision was an unreasonable application of the clearly established federal law of *Strickland*, or was contrary to that established law. Accordingly, 28 U.S.C. § 2254(d) bars habeas relief on this claim.

### 3.    Fair Cross-Section Claim (Claim 4(c))

Williams's complaint that his attorney was ineffective because he did not move to strike the jury panel or "rotate" panel members when the prospective jury panel lacked any African-Americans is unavailing because Williams does not show that his trial counsel committed a professional error in this regard.  *See* Pet. at 8a-8b.

In order to resolve this claim, the Court must first determine whether a fair cross-section claim would have had merit, since there could be no professional error unless the jury objection raised now by Williams had merit.  *See, e.g., Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir. 2007); *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998).  A fair cross-section claim originates in the Sixth Amendment, which guarantees a criminal defendant the right to a trial by a jury selected from a fair cross-section of the community.  *See Taylor v. Louisiana*, 419 U.S. 522, 527, 95 S. Ct. 692, 696 (1975).  To establish a prima facie violation of the fair cross-section requirement, a defendant must show that: (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process.  *Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 668 (1979); *see also Atwell v. Blackburn*, 800 F.2d 502, 505 (5th Cir. 1986).

Williams makes no attempt to meet the standard for a cross-section claim and demonstrate that his trial counsel had a basis for an objection.  First, Williams presents no evidence related to the second element of the *Duren* test because he cites only the composition of the venire panel in his case despite the fact that "a defendant cannot establish a prima facie violation of the fair-cross-section requirement by relying solely on the composition of the jury panel at his own trial."  *United States v. Alix*, 86 F.3d 429, 434 n.3 (5th Cir. 1996); *see also Timmel v. Phillips*, 799 F.2d 1083, 1086 (5th Cir. 1986) (explaining that petitioner must demonstrate that "this was the general practice in other venires" and that "[m]erely showing one case of alleged underrepresentation does not rise to a 'general' underrepresentation that is required for establishing a prima facie case").  Second, the fact that Williams cites only his particular venire composition is also indicative of a failure to satisfy the third *Duren* element: proving systematic exclusion.  To satisfy this element, underrepresentation must be shown to be inherent in the particular jury-selection process utilized.  *See Duren*, 439 U.S. at 366, 99 S. Ct. at 669.  One incident of a jury venire being disproportionate is not evidence of a "systematic" exclusion.  *Cf. id.* (concluding that petitioner's "demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic").  Thus, a single example of underrepresentation of a distinctive group fails to meet *Duren*'s systematic exclusion requirement.

Because Williams does not demonstrate a prima facie violation of *Duren*, there could be no ineffective assistance for failing to make a *Duren* challenge.  The state habeas court's decision denying Williams's claim is not contrary to, nor is it an unreasonable interpretation of, clearly

established federal law.  *See* 28 U.S.C. § 2254(d).  Accordingly, this claim is without merit and should be denied.

RECOMMENDATION

It is recommended that Williams's application for writ of habeas corpus be denied.

CERTIFICATE OF APPEALABILTY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1)(A).  Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, effective December 1, 2009, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000).  In cases in which a district court rejects a petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "When the district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of Williams's Section 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 1034 (2003) (citing *Slack*, 529 U.S. at 484, 120 S. Ct. at 1604). Accordingly, it is respectfully recommended that the Court shall not issue a certificate of appealability.

## OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battles v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall also bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 21st day of July, 2011.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE